**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**WALTER G. ADAMS,**

        **Plaintiff,**

**-vs-**                                   **Case No. 6:08-cv-30-Orl-28GJK**

**CITY OF ORLANDO, OFFICER BARBARA MCCLELLAND, OFFICER PETER CADIZ, and AN UNKNOWN SUPERVISOR,**

        **Defendants.**

_____

## ORDER

Plaintiff Walter G. Adams brings the instant action pursuant to 42 U.S.C. § 1983 for alleged violations of his constitutional rights. Plaintiff contends that two City of Orlando police officers—Defendants Barbara McClelland and Peter Cadiz—violated his rights under the Fourth, Fifth, and Fourteenth Amendments[1] when they arrested him without probable cause, searched his vehicle, and used excessive force. Plaintiff has named both officers as well as the City of Orlando as Defendants.

The case is now before the Court on the Dispositive Motion for Summary Judgment filed by the Defendants (Doc. 28). Plaintiff has filed a Response (Doc. 36) in opposition to the motion and, with permission of the Court (see Docs. 37 & 40), Defendants have filed a Reply (Doc. 41) to that Response. Having considered the parties' submissions and pertinent

---

[1]Plaintiff also alleged a violation of the Eighth Amendment in the Complaint. However, that aspect of his case been dismissed. (See Order, Doc. 20).

law, the Court concludes that Defendants' motion must be granted in part and denied in part.

## I. Background

During the early evening of January 8, 2004, Plaintiff was driving his brand new 2004 pearl white Cadillac CTS sedan toward the home that he shares with his wife, Juanita, in Orlando's Carver Shores neighborhood.[2] As he drove through the residential neighborhood on his way home, Plaintiff passed a marked Orlando Police Department patrol vehicle that was parked on the street, and nearby he saw a male police officer (Defendant Cadiz) and a female police officer (Defendant McClelland) standing on the curb talking to a female resident. (Pl. Dep., Attach. 1 to Doc. 29, at 19-20). Plaintiff continued home, making several turns to get to his street. (Id. at 22).

When Plaintiff arrived at his house, he parked the car in the street so that he could get out and unlock the gate that goes across his driveway and is part of a fence that encircles his property. (Id. at 26-27). After opening the gate doors, Plaintiff got back into the Cadillac and pulled it into the driveway. (Id. at 30). He then walked back to close the gate, and after he closed the left side a police car drove up and its lights were activated. (Id. at 30-31). Officer Cadiz was driving the car, and he told Plaintiff to "hold up, partner" and walked inside the fence. (Id. at 31; see also Cadiz Dep., Attach. 4 to Doc. 29, at 40-41). Cadiz then told Plaintiff that Ms. Perry—the resident with whom he and McClelland had been speaking when Plaintiff drove past—had said he was speeding. (Pl. Dep. at 31). Meanwhile, Officer McClelland had entered the fence, walked around Plaintiff, opened the

---

[2]In the Complaint, Plaintiff describes himself as "a Black Male residing in a predominantly Black neighborhood." (Doc. 1 ¶ 6).

door of the Cadillac, and started searching it. (Id. at 31).

The two officers then stepped aside and had a discussion with each other. (Id. at 32). Cadiz came back over to Plaintiff and told him that he smelled like alcohol. (Id.). This comment "pissed [Plaintiff] off" and he asked Cadiz "to get the F off [his] property." (Id.). As Plaintiff explained in his deposition, "it pissed me off because [McClelland] had already violated my rights by going into my car, opening the door and searching without my permission; so I told them to get the F off my property." (Id.). Cadiz then reached for him and put handcuffs on him. (Id. at 32-33).

According to Plaintiff, after he was handcuffed the officers marched him out the gate, and he, who at the time was fifty-three years old, told them that he had an artificial hip.[3] (Id. at 34). Plaintiff was concerned about getting into the back of the police car with his artificial hip, and he lay down facing the back window so that he could stretch his legs out. (Id.).

The officers drove Plaintiff to a law enforcement substation and placed him in a holding cell, still handcuffed. (Id. at 35-36). There was no chair or furniture of any kind in the holding cell; there was just a concrete floor with a drain and a steel door with a window. (Id. at 36; McClelland Dep., Attach. 3 to Doc. 29, at 55). Plaintiff "scooted" down the wall and sat on the floor; however, he was uncomfortable sitting on the floor of the holding cell with the handcuffs behind his back. (Pl. Dep. at 36-38). The pain became unbearable to

---

[3]Plaintiff has been receiving Social Security Disability payments since 1997 due to his hip replacement in 1995. (Pl.'s Answer to Defs.' First Interrogs., Attach. 2 to Doc. 29, at 1). Plaintiff's wife, who was home at the time of the incident and witnessed some of the events at issue, testified in her deposition that she heard Plaintiff tell the officers about his hip replacement and also told them about it herself. (Juanita Adams Dep., Attach. 5 to Doc. 29, at 20-21, 68).

Plaintiff, and he kept asking the sergeant to loosen the cuffs. (Id. at 36-37).

When no one responded to his request, Plaintiff scooted over to the door and shook it with his foot "to make a little racket," saying, "Loosen the cuffs." (Id. at 37). When Plaintiff did that, Officer Cadiz and another officer who weighed approximately 350-375 pounds came into the holding cell and placed him in a Ripp-Hobble restraint—a vinyl strap that is placed around the ankles and then runs behind the back to the handcuffs. (Id. at 37, 89, 91; McClelland Dep. at 54). In doing so, they first stood him up and then placed him on his chest. (Pl. Dep. at 91).

When Plaintiff was being put into the restraint, one of the officers put his foot or knee into Plaintiff's back and pushed his legs upward. (Id. at 43). Plaintiff was in a "rocking chair" position with his head on the concrete for fifteen minutes, at which point the officers came back to release him from the restraint. (Id. at 40; see also McClelland Dep. at 51). Plaintiff then was taken out of the holding cell and was asked to take a Breathalyzer test; Plaintiff declined. (Pl. Dep. at 40). After being at the substation for about an hour, Plaintiff was taken to the Orange County jail. (Id. at 42, 44). Eventually, Plaintiff was taken "upstairs" to what he considered "a kangaroo court" and then was released on his own recognizance. (Id. at 46).

Plaintiff was charged with DUI. According to Plaintiff's interrogatory responses, he pled no contest, adjudication was withheld, and the case was dismissed without any testimony being presented. (Attach. 2 to Doc. 29, at 3). He was ordered to attend "DUI Counterattack School" and successfully completed ninety days of probation. (Pl. Dep. at 53, 55).

When Plaintiff was being checked into the jail, he told the nurse he did not feel good in his chest area; this discomfort began that evening, and when he coughed he experienced pain in his rib cage area. (Id. at 44-45). After Plaintiff returned home, he told his wife about the chest pain and she took him to the emergency room the next day. (Id. at 58-59). X-rays of Plaintiff revealed a crack in his seventh rib, on the left side. (Id. at 59). Plaintiff was given Percocet for pain and was "out" for eight weeks. (Id. at 60-61).

Plaintiff denies speeding[4] and denies that he had anything alcoholic to drink at any time on the day of the incident. (Id. at 16, 18; see also Pl.'s Answer to Defs.' First Interrogs., Attach. 2 to Doc. 29, at 2). He does acknowledge, however, telling the officers, "I hope the Iranians blow [you] up" and telling one of the officers that he was going to "burn him," meaning that he "was going to sue him for what they had done to [him] when they went in [his] car and came on [his] property and falsely arrested [him]." (Pl. Dep. at 74-75).

The officers, however, maintain that Plaintiff was speeding,[5] that they heard the Cadillac's tires squealing before they saw it, that they smelled the odor of "burning brakes," and that they smelled alcohol on Plaintiff's breath when they were talking to him at his house. (McClelland Dep. at 36, 42; Cadiz Dep. at 39, 41). According to McClelland, they arrested Plaintiff for DUI based on "[s]melling the impurities of alcohol." (McClelland Dep. at 46).

---

[4]The speed limit in the area was twenty-five miles per hour. (McClelland Dep. at 35). Plaintiff estimates his speed at the time he passed the officers at fifteen to twenty miles per hour. (Pl. Dep. at 18).

[5]In his deposition, Officer Cadiz was unable to say how fast Plaintiff was going, (Cadiz Dep. at 35), while Officer McClelland estimated the speed at forty-five miles per hour, (McClelland Dep. at 35).

During her search of the car, McClelland observed a cup in the center console containing a clear fluid, but she did not test the fluid or do anything with it, instead just leaving it there. (Id. at 44).[6] Cadiz also recalls a cup with liquid in it, but he acknowledged that there is no mention of this cup in the report of the incident. (Cadiz Dep. at 41).

Neither officer recalls Plaintiff saying that he had an artificial hip, complaining that he was in pain, or asking to have the handcuffs loosened at the holding center, but they do recall him kicking the door of the holding cell. (McClelland Dep. at 46, 48-49, 56; Cadiz Dep. at 42, 45). It was McClelland's decision to place Plaintiff in the Ripp-Hobble restraint, and Cadiz placed the restraint on Plaintiff with the assistance of another officer. (McClelland Dep. at 52-53). According to McClelland, the Ripp-Hobble was imposed so that Plaintiff would not hurt himself by "violently kicking the door." (Id. at 49-50, 53). Cadiz, however, testified in his deposition that personnel at the center requested that he be restrained "because he was kicking the door to the holding cell and possibly damaging it." (Cadiz Dep. at 45).

## II. Discussion

### A. Summary Judgment Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

---

[6]McClelland explained that she did not take the container because Plaintiff's behavior had become disruptive—he was "yelling" and "swearing"—and they were more focused on controlling him. (McClelland Dep. at 44-45). Plaintiff and his wife testified that McClelland did remove from the car Plaintiff's asthma inhaler and a styrofoam container of boiled peanuts. (Juanita Adams Dep. at 20; Pl. Dep. at 31).

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

"'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.' Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Sawyer v. Sw. Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)); see also LaRoche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

### B. The Merits of Defendants' Motion

#### 1. The Claim Against the Officers

In the motion for summary judgment, Officers Cadiz and McClelland assert the defense of qualified immunity. "Qualified immunity protects municipal officers from liability in § 1983 actions as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "To receive qualified immunity, the officer must first show that he acted within his discretionary authority." Id. In the instant case, there is no assertion that Officers Cadiz and McClelland were not acting within their discretionary authority at the time of the events at issue. Thus, "the burden . . . shifts to the plaintiff to show that qualified immunity should not apply." Id.

In determining whether officers enjoy qualified immunity, courts typically employ a two-part process, determining "whether the officer's conduct amounted to a constitutional violation" and "whether the right violated was 'clearly established' at the time of the violation." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). While the Supreme Court in Saucier directed that the two steps of analysis be conducted in order, the Court "recently clarified . . . that the order of the inquiry is fluid, providing the Court with the flexibility to focus on the determinative question." Id. (citing Pearson v. Callahan, 129 S. Ct. 808 (2009)). In other words, it is now permissible but "not mandated that the Court examine the potential constitutional violation under Saucier step one prior to analyzing whether the right was clearly established under step two." Id. (citing Pearson).

### a. False Arrest and Search of Vehicle

The Fourth Amendment protects against unreasonable searches and seizures. "'In Fourth Amendment terminology, an arrest is a seizure of the person, and the "reasonableness" of an arrest is, in turn, determined by the presence or absence of probable cause for the arrest.'" Bates v. Harvey, 518 F.3d 1233, 1239 (11th Cir. 2008) (quoting Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007)). A law enforcement official has probable cause to arrest when the facts and circumstances of which he is aware are "'sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.'" Skop, 485 F.3d at 1137 (quoting United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002)). Probable cause is assessed on the totality of the circumstances. See id.

Even if probable cause is lacking, however, a law enforcement officer will not be personally liable for the arrest if the officer's judgment that probable cause existed is reasonable albeit mistaken. Id. The true test is "whether 'reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendant[] could have believed that probable cause existed to arrest.'" Id. (quoting Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002)) (emphasis omitted). "Thus, to establish a constitutional violation in a § 1983 false arrest claim, the plaintiff ordinarily must prove that the officer arrested h[im] without at least arguable probable cause to believe []he had committed or was committing a crime." Bates, 518 F.3d at 1239.

Because arresting a citizen without arguable probable cause violates clearly established law under established precedent, see Skop, 485 F.3d at 1143-44, the Court need only assess whether such arguable probable cause existed to determine if Defendants

Cadiz and McClelland are entitled to qualified immunity for arresting Plaintiff. "Whether an arresting officer possesses probable cause or arguable probable cause naturally depends on the elements of the alleged crime." Id. at 1137 (citing Crosby v. Monroe County, 394 F.3d 1328, 1333 (11th Cir. 2004)). Here, Plaintiff was arrested for DUI. The elements of this offense are "driving or in actual control of a vehicle . . . and [being] under the influence of alcoholic beverages . . . when affected to the extent that the person's normal faculties are impaired." § 316.193(1)(a), Fla. Stat.[7]

Summary judgment cannot be granted based on qualified immunity with regard to the false arrest claim because of disputed issues of material fact. Defendants assert that Plaintiff was speeding and smelled of alcohol, but Plaintiff denies speeding and states that he had not had anything alcoholic to drink that day. The Court must construe the facts in Plaintiff's favor at this stage of the case, and under his version of the facts, arguable probable cause to arrest him for DUI did not exist.[8] See, e.g., Kingsland v. City of Miami, 382 F.3d 1220 (11th Cir. 2004) (reversing trial court's grant of summary judgment to officers on qualified immunity grounds where plaintiff and officers presented conflicting versions of events leading to plaintiff's arrest, and plaintiff's version had to be credited in resolving motion). Thus, the officers' claim of qualified immunity cannot be resolved in their favor on

---

[7]The statute also provides alternatives to the second element based on specific blood-alcohol and breath-alcohol levels. See § 316.193(1)(b)-(c), Fla. Stat.

[8]Officer McClelland stated in her deposition that at first they sought Plaintiff because he was driving recklessly. (McClelland Dep. at 38-39). Reckless driving is defined by Florida statute as "driv[ing] any vehicle in willful or wanton disregard for the safety of persons or property." § 316.192(1), Fla. Stat. Disputed issues of material fact remain with regard to this offense as well.

-10-

this motion with regard to the arrest of Plaintiff.

The same result obtains with regard to the search of Plaintiff's car. The Supreme Court has held "that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" Arizona v. Gant, 129 S. Ct. 1710, 1719 (2009) (quoting Thornton v. United States, 541 U.S. 615, 632 (2004)). However, because there are disputed factual issues remaining with regard to the lawfulness of Plaintiff's arrest, there are also issues remaining with regard to the lawfulness of the vehicle search. See Henry v. United States, 361 U.S. 98, 102 (1959) ("[I]f an arrest without a warrant is to support an incidental search, it must be made with probable cause.").

### b. Excessive Force

Plaintiff also alleges that the officers used excessive force in placing him in the patrol car at his home and in placing him in a Ripp-Hobble restraint at the detention center. As an initial matter, to the extent that Plaintiff's arrest may have been unlawful as not supported by probable cause, his excessive force claim is subsumed within his false arrest claim. "[I]f an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest." Bashir v. Rockdale County, 445 F.3d 1323, 1332 (11th Cir. 2006). "[E]ven de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect." Zivojinovich v. Barner, 525 F.3d 1059, 1071 (11th Cir. 2008). In other words, if Plaintiff was not lawfully arrested, the force used in that arrest becomes part of his damages claim for that unlawful arrest.

It is also possible, of course, for Plaintiff to have an independent claim for excessive

force even if his arrest is determined to have been lawful. "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, 394 (1989). "The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Id. "[T]he two primary sources of constitutional protection against physically abusive governmental conduct" are the Fourth Amendment, which prohibits unreasonable seizures, and the Eighth Amendment, which proscribes cruel and unusual punishment. Id. Another possible source of such protection, the Fourteenth Amendment's due process guarantee, applies to "[c]laims involving the mistreatment of arrestees or pretrial detainees in custody." Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996).

Although Plaintiff alleged an Eighth Amendment violation in his Complaint, this Court dismissed that part of his claim because the Eighth Amendment applies only to claims by convicted prisoners. See id.; Graham, 490 U.S. at 395 n.10 ("After conviction, the Eighth Amendment 'serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified.'" (quoting Whitley v. Albers, 475 U.S. 312, 327 (1986)) (alterations in original)). Thus, only two potential sources of the right asserted remain—the Fourth Amendment's proscription on unreasonable seizures and the Fourteenth Amendment's due process guarantee.

Identifying the source of the right asserted is important because the standards for obtaining relief vary. Under the Fourth Amendment, courts "analyze whether defendants used excessive force by determining whether 'the officers' actions are objectively reasonable

in light of the facts and circumstances confronting them.'" <u>Garrett v. Athens-Clarke County</u>, 378 F.3d 1274, 1279 (11th Cir. 2004) (quoting <u>Graham</u>, 490 U.S. at 397) (further internal quotation omitted). On the other hand, under the Fourteenth Amendment the "use of force against a pretrial detainee is excessive . . . if it 'shocks the conscience.'" <u>Fennell v. Gilstrap</u>, 559 F.3d 1212, 1217 (11th Cir. 2009). This standard has also been stated as "requir[ing] a showing of deliberate indifference to a substantial risk of serious harm." <u>Hicks v. Moore</u>, 422 F.3d 1246, 1253 n.7 (11th Cir. 2005). Additionally, the Eleventh Circuit has held that although the right of pretrial detainees is a Fourteenth Amendment due process right rather than an Eight Amendment "cruel and unusual punishment"-based right, cases involving Eighth Amendment claims may be relied upon in analyzing Fourteenth Amendment excessive force claims. <u>See</u> <u>Cottrell</u>, 85 F.3d at 1490 ("[D]ecisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees."). Under Eighth Amendment case law, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992).

### (1) Handcuffing and Placing in Squad Car

The matter of whether the officers used excessive force in their treatment of Plaintiff in handcuffing him and placing him in the squad car is properly analyzed under the Fourth Amendment because during that time he was being seized and placed under arrest. Thus, the officer's actions are analyzed under an "objective reasonableness" standard.

The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some

-13-

degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. The "proper application [of the reasonableness test] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." Id. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

"[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id. "[T]he application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000).

Under the Fourth Amendment objective reasonableness standard, Plaintiff does not have an independent excessive force claim based on the handcuffing and placement into the police car. Even under Plaintiff's version of the facts, he was able to get into a satisfactory position in the back of the police car despite his artificial hip, (see Pl. Dep. at 34), and his assertion that the handcuffs were "too tight" does not in and off itself give rise to a constitutional violation. Plaintiff's wife did testify in her deposition that Plaintiff had bruises around both wrists after the incident, (Juanita Adams Dep. at 39), but Plaintiff has not identified any injury from the tightness of the handcuffs. In his answers to interrogatories,

the only injury he identified as the basis for damages in this case was his fractured rib. (See Attach. 2 to Doc. 29, ¶ 10). He has not adduced evidence establishing an excessive force claim under the Fourth Amendment based on the handcuffs being too tight or being placed in the police car. See Nolin, 207 F.3d at 1255-58 (reversing district court's denial of qualified immunity in case involving handcuffing that resulted in bruising for which medical treatment was not sought, finding that minimal amount of force and injury did not overcome such immunity); Gold v. City of Miami, 121 F.3d 1442, 1446 (11th Cir. 1997) (reversing denial of qualified immunity where plaintiff experienced pain from handcuffs for twenty minutes but suffered only skin abrasions for which he did not seek treatment).

### (2) Use of the Ripp-Hobble Restraint at the Substation

While the Fourth Amendment plainly governs the handcuffing and placing into the police car, the issue of whether the Fourth Amendment of the Fourteenth applies to Plaintiff's assertions regarding use of the Ripp-Hobble restraint while he was in the holding cell at the substation requires brief discussion. As noted earlier, the Fourth Amendment governs seizures, including arrests, but the Fourteenth Amendment governs claims of mistreatment of arrestees and pretrial detainees in custody. "The precise point at which a seizure ends (for purposes of Fourth Amendment coverage) and at which pretrial detention begins (governed until a conviction by the Fourteenth Amendment) is not settled in this Circuit." Hicks, 422 F.3d at 1253 n.7; cf. Orem v. Rephann, 523 F.3d 442, 446 (4th Cir. 2008) (noting that similarly, in the Fourth Circuit, "[t]he point at which Fourth Amendment protections end and Fourteenth Amendment protections begin is often murky"). Although in their motion papers the parties discuss the Fourth Amendment with regard to all aspects of Plaintiff's

excessive force claim, this Court is compelled to find that the Fourteenth Amendment, not the Fourth, applies to the Ripp-Hobble portion of the case.

The Eleventh Circuit Court of Appeals has acknowledged that the precise line between excessive force claims governed by the Fourth Amendment and excessive force claims governed by the Fourteenth Amendment is not well-defined, but in a recent case that court analyzed an excessive force claim under the Fourteenth Amendment rather than the Fourth where the force occurred in a context similar to that involved in the instant case. In Fennell v. Gilstrap, 559 F.3d 1212 (11th Cir. 2009), the plaintiff had been arrested and transported in a police car to the jail; the allegedly excessive force occurred in the "pat-down room" shortly after his arrival there.[9] This Court finds that if the chain of events in Fennell is sufficient to transfer the source of the right at issue from the Fourth Amendment to the Fourteenth Amendment in this circuit, then the circumstances of the instant case certainly are—here, there was a lapse of time from Plaintiff being placed in the holding cell until the Ripp-Hobble was applied, whereas in Fennell the events from the outset of the arrest to the application of the force are described as essentially a continuous sequence. Thus, this portion of Plaintiff's excessive force claim is analyzed under the Fourteenth Amendment rather than the Fourth.[10]

---

[9]The Fennell court did not discuss the competing standards, but it did note that the district court had construed the claim as a Fourteenth Amendment violation because the plaintiff was a pretrial detainee at the time the force was applied. See 559 F.3d at 1215; see also id. n.4 (noting that the plaintiff had argued for a finding of a Fourth Amendment violation in his initial brief but then correctly stated in his reply brief that his claim arose under the Fourteenth Amendment).

[10]Because the Fourteenth Amendment governs, the qualified immunity analysis only

Again, under the Fourteenth Amendment, force is excessive if it "shocks the conscience," Fennell, 559 F.3d at 1217, evidences "deliberate indifference to a substantial risk of serious harm," Hicks, 422 F.3d at 1253 n.7, or was applied "maliciously and sadistically to cause harm," McMillian, 503 U.S. at 7. Under any of these formulations of the standard, Plaintiff's claim regarding use of the Ripp-Hobble restraint fails. These standards are very difficult to meet, and claims on more egregious facts have been rejected. See, e.g., Fennell (finding that kick to detainee's face with military-style boot, resulting in orbital, septal, and nasal fractures, did not amount to unconstitutionally excessive force where kick was not intentionally directed at face). Plaintiff has acknowledged that he was kicking the cell door and screaming, and when asked at his deposition if he knew why the Ripp-Hobble restraint was applied, he responded, "Because I was making that noise." (Pl. Dep. at 39). The force used here cannot be characterized as "conscience-shocking" or "malicious and sadistic." Thus, Plaintiff's excessive force claim based on the use of the Ripp-Hobble restraint fails.

2. The Claim Against the City

Plaintiff also brings a § 1983 claim against the City, asserting that the City failed to supervise the officers, failed to properly train them or deter them from their conduct, and "had notice of the Defendant-officers['] proclivity to harass, disrespect and wrongfully arrest

---

involves the first Saucier prong. See Fennell, 559 F.3d at 1216-17 ("For claims of excessive force in violation of the Eighth or Fourteenth Amendments, . . . a plaintiff can overcome a defense of qualified immunity by showing only the first prong, that his Eighth or Fourteenth Amendment rights have been violated. We created this rule because . . . 'the subjective element required to establish [such a violation] is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution. . . .'" (quoting Johnson v. Breeden, 280 F.3d 1308, 1321-22 (11th Cir. 2002)) (last alteration in original)).

Black Americans." (Doc. 1 ¶¶ 2 & 24). "A city may only be held liable under 42 U.S.C. § 1983 when the injury caused was a result of municipal policy or custom." Lewis, 561 F.3d at 1293. "Municipal policy or custom may include a failure to provide adequate training if the deficiency 'evidences a deliberate indifference to the rights of its inhabitants.'" Id. (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). "To establish a city's deliberate indifference, 'a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.'" Id. (quoting Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)). "A city may be put on notice in two ways"—if it is aware of "a pattern of constitutional violations" but "nevertheless fails to provide adequate training" or "if the likelihood for constitutional violation is so high that the need for training would be obvious." Id.

In support of the summary judgment motion with regard to the claim against the City, Defendants have submitted an affidavit of Sergeant James Brooks (Attach. 6 to Doc. 29), who was the supervisor of Officers of Cadiz and McClelland at the time of the events at issue. Attached to that affidavit are training records of the officers and copies of some of the policies and procedures of the Orlando Police Department, including the policies regarding use of force and booking procedures.

Plaintiff, on the other hand, has not submitted any evidence along with his opposition memorandum, and the memorandum barely mentions his claim against the City. At the end of the "Background" section, Plaintiff asserts that the City has "failed to address Officers Cadiz and McClelland's ongoing mistreatment of black citizens in the Carver Shores neighborhood or to take actions to prevent pre-textual arrests, or to limit the use of Ripp-

-18-

Hobble Restraint when the detainee is already restrained in handcuffs and in pain." (Doc. 36 at 7). Later, Plaintiff asserts that "the City of Orlando Police Department did not take appropriate action to discipline Officers Cadiz and McClelland despite their admission to making pre-textual arrests[ and to] targeting and mistreating black citizens in the Carver Shores neighborhood." (Doc. 36 at 10).

However, Plaintiff does not identify a specific deficiency in any policy of the City, nor has he substantiated his assertions of prior problems with these officers that allegedly put the City on notice of a need for training. Although Officer Cadiz did admit in his deposition that nearly all of his stops in that neighborhood are pretextual (Cadiz Dep. at 19), these officers have not admitted to "targeting and mistreating black citizens," as boldly alleged by Plaintiff. Moreover, the making of pretextual stops does not in and of itself violate the Constitution. See Whren v. United States, 517 U.S. 806, 813 (1996) (holding that the constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved). Plaintiff deposed both officers and questioned them about prior incidents, but he does not cite to any specific evidence of incidents or disciplinary history that allegedly apprised the City of a need to train, and he certainly has not identified evidence that the City was "deliberately indifferent." Plaintiff may not rely on vague assertions to overcome summary judgment on this point. He has not presented evidence of a municipal custom or policy or a failure to train or supervise that led to any constitutional violations. Thus, the motion for summary judgment must be granted as to the claims against the City.

### III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that the Dispositive Motion for Summary Judgment filed by the Defendants (Doc. 28) is **GRANTED in part** and **DENIED in part**. Insofar as the motion pertains to the claims against the City, the motion is **GRANTED**, and insofar as the motion pertains to the individual Defendants, the motion is **GRANTED in part** and **DENIED in part** as set forth herein.

**DONE** and **ORDERED** in Orlando, Florida this 24th day of August, 2009.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party